UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENROSE HILL, LIMITED, et al., | Case No.  20-cv-01169-DMR |
| Plaintiffs, | |
| v. | **ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND SPECIAL MOTION TO STRIKE** |
| PAUL MABRAY, | |
| Defendant. | Re: Dkt. No. 18 |

Plaintiffs Penrose Hill, Limited ("Penrose Hill") and Philip James filed this action on February 14, 2020, alleging a single state law claim for defamation against Defendant Paul Mabray. [Docket No. 1 ("Compl.").]  Jurisdiction is based on diversity.[1]  Mabray now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rule") 12(c) and to strike the complaint pursuant to California Code of Civil Procedure ("CCP") § 425.16.  [Docket Nos. 18 ("Mot."), 31 ("Reply").]  Plaintiffs timely opposed.  [Docket No. 29 ("Opp.").]  The court held a hearing on July 9, 2020.

For the reasons stated below, Mabray's motion under CCP § 425.16 is denied and his Rule 12(c) motion is granted.

# I.     BACKGROUND

## A.     Penrose Hill's Operations

The following facts are alleged in the complaint.[2]  Penrose Hill is a Delaware corporation

_____

[1] The court issued an order to show cause requesting more information about James's citizenship for diversity purposes. [Docket No. 39.]  James filed a declaration establishing that he is a citizen of Great Britain and a permanent resident of the United States, but not a dual citizen.  [Docket No. 40.]  He also submitted evidence that he has resided in Nork York since 2003 until the present. Accordingly, the court is satisfied that the requirements for diversity jurisdiction have been met in this case.

[2] As explained further below, a federal court evaluating a motion brought under California's anti-SLAPP law must treat legal challenges as if they were brought under Rule 12(b)(6) standards, while factual challenges must be decided after there has been an opportunity to conduct discovery. Accordingly, the court need not consider the parties' evidentiary submissions for the purpose of determining either motion.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (when reviewing a

with a principal place of business in New York City, New York.  Compl. ¶ 5.  It is a federally licensed and bonded winery business.  *Id.* ¶ 2.  Penrose Hill is one of the largest wineries in the United States, and sells millions of bottles of wine per year, both domestically and internationally.  *Id.* ¶ 3.  James founded Penrose Hill in 2015 and is currently the CEO of the company.  *Id.* ¶¶ 12-13.  He describes himself as an "entrepreneur who has spent his career working in the wine industry."  *Id.* ¶ 12.  He has masters' degrees in computational chemistry and business administration and has been qualified as a Certified Specialist of Wine by the Society of Wine Educators.  *Id.* Starting in 2005, James has "built several of the largest online wine businesses in the United States" and has been recognized by various institutions for his contributions to the wine industry.  *Id.*

Penrose Hill employs its own team of winemakers, designers, and data scientists, which has enabled it to "create its own unique portfolio of wines."  Compl. ¶ 14.  Penrose Hill's wines have won over 1,000 wine awards since the company was founded in 2015 and are sold throughout the United States as well as internationally.  *Id.* ¶¶ 14, 17.  Penrose Hill also "sources top quality wines from around the world."  *Id.* ¶ 21.  Unlike traditional wine businesses, Penrose Hill uses a direct-to-consumer distribution model.  *Id.* ¶ 4.  Through its website, Firstleaf.com, Penrose Hill operates the Firstleaf Wine Club ("Firstleaf"), which is an online wine subscription service.  *See id.* ¶¶ 18-20.  Members receive wines that are matched to their individual preferences through an algorithm developed by Penrose Hill's in-house data science team.  *Id.* ¶ 20.

**B.**     **Allegedly Defamatory Statements**

Mabray is a well-known wine blogger who has been involved in the wine industry for over two decades.  Compl. ¶¶ 24-25.  According to Plaintiffs, traditional wine bloggers like Mabray "do not like the disruptive nature" of services like Penrose Hill's because "they are frequently paid by traditional wine businesses that seek to maintain the status quo."  *Id.* ¶ 23.  Plaintiffs also allege that Mabray has a "vested interest, including a financial interest, in the digital and e-commerce wine industries," since he founded two internet wine companies and is the CEO of a wine industry data analytics company.  *Id.* ¶¶ 26-28.

On December 11, 2017, Mabray published the blog post that is the subject of this defamation action ("Blog Post").  *See* Compl., Ex. A (blog post on medium.com dated Dec. 11, 2017).  The Blog

motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint" (per curiam) (citation omitted)).

United States District Court
Northern District of California

United States District Court
Northern District of California

Post is titled "Fakers Not Makers and The Return of Philip James."  The first part of the article referenced a "new subscription economy in the wine industry," and stated that some wine sellers expanding into the online market follow a traditional model where they "search[] to find good deals or great new finds to bring to wine consumer[s]."  Mabray then critiqued other wine subscription services that "look to participate in the [wine] market by sourcing bulk juice and creating false brands to fool unsophisticated consumers."  According to Mabray, these "fakers" propagate an "illusion that they have access to unique pricing and juice that equals the great and family owned brands at huge savings."  He wrote that he does not think "all the wines they make are bad nor ALL of their wines are manufactured labels" but that these companies are "mostly substituting plonk in the place of artisanal wine."  While Mabray listed several companies that he believes are engaging in this "inauthentic" model, Penrose Hill was not among them.

The second part of the article turns to a discussion of James, "one of wine-techs [*sic*] interesting characters."  Mabray reviewed James's positive public image as a supporter of charity and a successful wine-tech entrepreneur but then seemed to criticize that image, stating that "most of us in the industry remember a different story."  He claimed that another company James previously founded competed with a service called "Cellartracker," and that James committed an "egregious act of scraping . . . data from Cellartracker.com."  Mabray then criticized another of James's business ventures for "spending a dollar to make $0.50," laying off 35% of its employees, and eventually "transform[ing] into the Hot Topic of wine retailers."  Mabray also asserted that James started a charity fundraising campaign about a fictional device that supposedly turns water into wine.  Although Mabray acknowledged that the campaign turned out to be "an elaborate stunt for a good cause," he stated that "quite a few of the press were duped into featuring the absurd campaign claims."   He wrote that "many of us inside the wine industry were not surprised that it was yet another hoax from Philip James.  Fool me once, shame on you.  Fool me twice, shame on me."

After reviewing the history of James's allegedly dubious past in the wine industry, Mabray announced that "now [James is] back in wine and armed with $4,000,000 he has created a tangled web of companies starting with Penrose Hill at the top."  He claimed that once "you drill down . . . past [the] parent company . . . you see they are all just shells on top of the one theme – taking plonk and repacking it."  Mabray wrote that Firstleaf is "claiming to unleash the cost shackles for the

3

consumer to allow them exclusive access to vineyards and winemakers."  Mabray then cast doubt on that claim, stating that:

> So with all this new cadre of fakers vs makers what should we believe out from [*sic*] from Philip James and the his [*sic*] collection of companies?  That he is a good actor returning to wine after two failed attempts to help the industry become better?  A maker of companies to help the consumer?  Or a faker, returning again to prey on the market conditions and ignorance of the consumer?  Regardless of his intentions the key is that we all remain diligent in helping educate consumers on the difference between the fakers and the makers.

*Id.* at 5.

Plaintiffs claim that the Blog Post contains defamatory statements about Penrose Hill and James that falsely accuse them of dishonesty with respect to their wine marketing and inaccurately portray James as incompetent and unfit to run a wine business.  Compl. ¶¶ 32-33.  Plaintiffs also assert that Mabray's statements about James's activities prior to founding Penrose Hill, such as "scraping . . . data from Cellartracker.com" and perpetrating a hoax with respect to his charity fundraising event, are defamatory because they are false and impute fraud to James.  *Id.* ¶¶ 23-24.  According to Plaintiffs, the statements are false because Penrose Hill, which is founded and run by James, "is a winery licensed . . . both federally and by the State of California, creates real wine brands, and does not misrepresent or obfuscate the nature, quality, or source of its wines."  *Id.* ¶ 35.  Plaintiffs allege that the Blog Post was and has been read by "individuals at all levels in the wine industry, including investors, wine producers, wine distributors, wine retailers, and wine consumers," and that the defamatory statement prevented those stakeholders from trusting James and conducting business with him and Penrose Hill.  *Id.* ¶¶ 37-38.  Plaintiffs state that the false statements in the Blog Post have interfered with their business relationships and they have lost business opportunities as a result.  *Id.* ¶¶ 39-40.

On July 26, 2019, a non-party Twitter user posted an article and quoted some text from the source:

> Retail on the high street is changing.  More grocery shopping is being done online & wine choice [is] less well-informed without personal advice in store.  How do you see the future of wine sales developing given the shift to more digital purchasing?

Compl., Ex. B.  Another user tweeted in response: "This sounds like the Naked/Majestic route.  Own-brand ranges on the up?  Does this then shift the onus on producer to find distributor even more?"

Mabray then responded to that user:

> PL/CL[3] is more of a UK phenomenon than US (but we're moving that way).
> I don't think it's bad as long as it has purpose & transparency.  Re: Naked
> & that ilk – don't get me started –

*Id* ("Tweet").  The Tweet linked to the Blog Post, and the link displayed a preview of the article with the photo of James used in the Blog Post, the title of the post, and a quote from the article:  "There is a new era of companies trying to capitalize on the new subscription economy in the wine industry.  Some good, some fakers."  Plaintiffs claim that the Tweet constitutes a republication of the initial defamation and that it was intended to garner a larger audience for the defamatory statements.  *Id.* ¶¶ 41-44.

Plaintiffs bring a single claim for defamation under California Civil Code § 44 *et seq.*  They seek injunctive relief in the form of ordering Mabray to remove the Blog Post from the internet (including from his Medium and Twitter accounts), enjoining him from continuing to publish the defamatory statements, and directing him to publicly retract his statements.[4]  They seek general, compensatory, and presumed damages in the amount of at least $1,000,000.  Mabray moves for judgment on the pleadings pursuant to Rule 12(c), to strike the complaint pursuant to CCP § 425.165, and for an award of attorneys' fees and costs pursuant to CCP § 425.16(c)(1).

## II.    LEGAL STANDARDS

### A.    California Anti-SLAPP Motions in Federal Court

Known as the "anti-SLAPP" statute,[5] CCP § 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation."  *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017) (quoting *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001)).  The statute provides that a claim against an individual "arising from any act of that person in furtherance of the person's right of petition or free speech" under the federal or California constitutions "shall be subject to a

---

[3] "PL/CL" refers to "private label" and "control label," which are interchangeable terms that refer to brands that a retailer owns and/or controls.  [Docket No. 19, Declaration of Paul Mabray ("Mabray Decl.") ¶ 9.]

[4] According to Mabray, Medium removed the Blog Post from its platform after this lawsuit was filed.  Mabray Decl. ¶ 5.

[5] "SLAPP" is an acronym for "strategic lawsuit against public participation."

1  special motion to strike . . . ." Cal. Civ. Proc. Code § 425.16(b)(1).

2  Under California law, "[t]he analysis an anti-SLAPP motion proceeds in two steps." *Iglesia
3  Ni Cristo v. Cayabyab*, Case No. 18-cv-00561-BLF, 2019 WL 3997474, at *2 (N.D. Cal. Aug. 23,
4  2019) (quoting *Barry v. State Bar of California*, 2 Cal. 5th 318, 321 (2017)).  First, the court
5  determines whether the plaintiff's claims are directed at "an act in furtherance of protected
6  expression." *Metabolife*, 264 F.3d at 840 (citing Cal. Civ. Proc. Code § 425.16(b)). The moving
7  defendant bears the burden of "identifying all allegations of protected activity, and the claims for
8  relief supported by them." *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016).  At the second step, the
9  burden shifts to the plaintiff to show a "reasonable probability of prevailing in its
10  claims." *Metabolife*, 264 F.3d at 840.  The plaintiff must demonstrate that "each challenged claim
11  based on protected activity is legally sufficient and factually substantiated." *Baral*, 1 Cal. 5th at 396.

A district court sitting in diversity must apply the federal standard for such motions.  Under
12  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity apply state
13  laws to matters of substance, but federal law governs matters of procedure.  *See Hanna v. Plumer*,
14  380 U.S. 460, 473 (1965).  Applying state anti-SLAPP laws in federal court raises unique
15  considerations because many anti-SLAPP provisions are procedural and therefore may conflict with
16  the Federal Rules of Civil Procedure.  In *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*
17  *Progress*, the Ninth Circuit discussed one such tension between California's anti-SLAPP law and
18  federal procedure.  890 F.3d 828, 833 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018).  When a
19  defendant files an anti-SLAPP motion in California state court, "[a]ll discovery proceedings in the
20  action" are stayed and the discovery stay "remain[s] in effect until notice of the entry of the order
21  ruling on the motion." Cal. Code Civ. Proc. § 425.16(g).  However, in federal court, "[r]equiring a
22  presentation of evidence without accompanying discovery would improperly transform the motion
23  to strike . . . into a motion for summary judgment without providing any of the procedural safeguards
24  that have been firmly established by the Federal Rules of Civil Procedure." *Planned Parenthood*,
25  890 F.3d at 833-34.    The court held that preserving the discovery stay aspect of section
26  425.16 "would effectively allow the state anti-SLAPP rules to usurp the federal rules" and that the
27  court cannot "properly allow such a result." *Id.* at 834.  Accordingly, *Planned Parenthood* set forth
28  the standard that district courts must now apply in evaluating anti-SLAPP motions:

If a defendant makes an anti-SLAPP motion to strike founded on purely

6

> legal arguments, then the analysis is made under [Rule] 8 and 12 standards;
> if it is a factual challenge, then the motion must be treated as though it were
> a motion for summary judgment and discovery must be permitted.

*Id.* at 833 (quoting *Z.F. v. Ripon Unified School District*, 482 Fed. App'x 239, 240 (9th Cir. 2012)).
For purely legal challenges, there is no need for the party opposing the motion to "submit evidence
showing the merit of their claims." *Id.* at 834. For factual challenges, "discovery must be allowed,
with opportunities to supplement evidence based on the factual challenges, before any decision is
made by the court." *Id.*

This court previously interpreted *Planned Parenthood* to mean that district courts must apply
a two-step standard for evaluating anti-SLAPP motions. *See Todd v. Lovecruft*, Case No. 19-cv-
01751-DMR, 2020 WL 60199, at *8 (N.D. Cal. Jan. 6, 2020). First, it must apply step one of
California's burden-shifting standard and look at whether the plaintiff has met the burden to show
that the allegedly defamatory statements were made "in furtherance of protected expression." *See
id.* (quoting *Metabolife*, 264 F.3d at 840). If the plaintiff makes an adequate showing on the first
step, then the court looks at whether the defendant's challenges are legal or factual. *Id.* If the
challenges are legal, the court evaluates the motion under Rule 12. *Id.* But if the challenges are
factual, then the court must permit discovery under Rule 56. *Id.* "Once discovery has been
completed, then the court applies the 'reasonable probability' standard to the plaintiff's claims." *Id.*

The current motion raises both legal and factual challenges. *See* Mot. at 11. Mabray's factual
challenges are premature as no discovery has yet taken place.[6] Thus, for the reasons explained above
and in *Todd*, the court will evaluate only Mabray's legal challenges to Plaintiffs' complaint.

**B.      Rule 12(c) Motions**

"After the pleadings are closed—but early enough not to delay trial—a party may move for
judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings
"challenges the legal sufficiency of the opposing party's pleadings." William Schwarzer et al,
*Federal Civil Procedure Before Trial* ¶ 9:316 (2014). "Rule 12(c) is functionally identical to Rule
12(b)(6) and . . . the same standard of review applies to motions brought under either rule." *Cafasso,
U.S. ex rel. v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n. 4 (9th Cir. 2011). Thus, a

---

[6] In *Todd*, the parties explicitly waived their right to discovery. The court accepted the parties' express waivers and ruled on the factual as well as legal issues raised in that anti-SLAPP motion. *Id.* In this case, however, the parties have not explicitly waived their right to discovery.

7

judgment on the pleadings is appropriate when the pleaded facts, accepted as true and viewed in the light most favorable to the non-moving party, entitle the moving party to a judgment as a matter of law. *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1301 (9th Cir. 1992); *see also Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

## III.    DISCUSSION

Mabray argues that Plaintiffs' complaint should be dismissed under Rule 12(c) and/or stricken under CCP § 425.16 for several reasons: (1) Plaintiffs' defamation action is time-barred under the statute of limitations insofar as it is based on the Blog Post; (2) the Tweet is not defamatory as to Penrose Hill because it is not "of or concerning" the corporation; (3) most of the statements made in the Tweet and Blog Post constitute non-actionable opinion; (4) the factual statements in the Blog Post are at least substantially true; and (5) James has failed to adequately plead and prove that Mabray made the allegedly defamatory statements with the requisite state of mind. For the reasons stated below, the court need not reach all of these arguments in order to render a decision on this motion.

The court first addresses the threshold question of whether the complaint is timely, and then evaluates Mabray's anti-SLAPP and Rule 12(c) motions in turn.

### A.    Statute of Limitations

Under California law, the statute of limitations for defamation actions is one year. Cal. Civ. Code § 340(c). A claim for defamation accrues when the defendant publishes a defamatory statement by communicating it to a third person who "understands its defamatory meaning as applied to the plaintiff." *Shively v. Bozanich*, 31 Cal. 4th 1230, 1237, 1242 (2003), *as modified* (Dec. 22, 2003). Under the single-publication rule, publication of a defamatory statement "generally is said to occur on the first general distribution of the publication to the public." *Id.* at 1243. The rule "limits tort claims premised on mass communications to a single cause of action that accrues upon the first publication of the communication, thereby sparing the courts from litigation of stale claims where an offending book or magazine is resold years later." *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1166-67 (2011) (internal quotation marks, citation, and alterations omitted); *see also* Cal. Civ. Code § 3425.3 ("No person shall have more than one cause of action . . . for libel or slander . . . founded upon any single publication or exhibition or utterance . . . ."). However, "the statute of limitations is reset when a statement is republished." *Yeager v. Bowlin*,

693 F.3d 1076, 1082 (9th Cir. 2012); *see also Shively*, 31 Cal. 4th at 1242 ("Each publication ordinarily gives rise to a new cause of action for defamation."). Republication occurs "when the original defamer repeats or recirculates his or her original remarks to a new audience." *Shively*, 31 Cal. 4th at 1243.

Mabray published the Blog Post on December 11, 2017 and this action was filed on February 14, 2020. He asserts that the complaint is untimely as to the Blog Post because the allegedly defamatory statements contained in the article were published more than a year before Plaintiffs filed this case. Plaintiffs argue that their claim is not time-barred because Mabray's 2019 Tweet linking to the Blog Post constitutes a republication of the original defamation.

Whether the Tweet is a republication that resets the statute of limitations with respect to the statements in the Blog Post depends on whether the Tweet and Blog Post are part of the same "single integrated publication." *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468, 477 (2009). The single publication rule applies to "the issue of any one edition of a newspaper, magazine or book; to any one broadcast over radio or television; to any one exhibition of a motion picture; to any one theatrical performance or other presentation to an audience; and to any similar aggregate communication that reaches a large number of persons at the same time." Rest. 2d Torts § 577A (1977); *see, e.g.*, *Belli v. Roberts Bros. Furs*, 240 Cal. App. 2d 284 (1966) (holding that an allegedly defamatory statement appearing in a newspaper was not republished when it was repeated in later editions of that day's newspaper). By contrast, republication of a hardbound book in paperback form constitutes a new "issue" that resets the statute of limitations. *Kanarek v. Bugliosi*, 108 Cal. App. 3d 327, 332 (1980). The single publication rule extends to content posted on the internet, but "[a]pplying the single-integrated-publication test to nontraditional publications can be tricky." *Yeager*, 693 F.3d at 1081. The Ninth Circuit has held that, once a defendant publishes a statement on a website, continuing to host the website is not a republication because inaction (i.e. failing to retract a statement) cannot serve as the basis for a new claim. *See Roberts*, 660 F.3d at 1168-69. Similarly, "a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience." *Yeager*, 693 F.3d at 1082.

The Ninth Circuit and California courts have not yet determined whether a website containing allegedly defamatory content is "directed to a new audience" when a defendant subsequently links to the website on a different forum. Elsewhere, courts have generally held that

merely linking to or referring to a defamatory article does not constitute republication.  In *Salyer v. S. Poverty Law Ctr., Inc.*, cited by Mabray, the defendant posted an article on its website that accused the plaintiff of being a member of an extremist group who was dishonorably discharged from the military and disbarred from practicing law before military courts.  701 F. Supp. 2d 912, 913-14 (W.D. Ky. 2009) (applying Kentucky law).  Several subsequent articles on the website referenced and included links to the original article.  *Id.* at 914.  The plaintiff did not argue that the later articles were defamatory, and they did not make any specific mention of him.  *Id.* at 915.  Instead, he asserted that the later articles republished the allegedly defamatory statements by referencing and hyperlinking to the original article.  *Id.* at 916.  The court held that merely referencing a prior article is not a republication:

> [T]he common thread of traditional republication is that it presents the material, in its entirety, before a new audience. A mere reference to a previously published article does not do that.  While it may call the *existence* of the article to the attention of a new audience, it does not present the *defamatory contents* of the article to that audience.  Therefore, a reference, without more, is not properly a republication.

*Id.* (emphasis in original).  The court noted that the outcome might be different if the later articles "restated the defamatory remarks."  *Id.* at 916 n. 5.  The Third Circuit, applying Pennsylvania law, adopted the reasoning in *Salyer*, explaining:

> The single publication rule advances the statute of limitations' policy of ensuring that defamation suits are brought within a specific time after the initial publication.  Websites are constantly linked and updated.  If each link or technical change were an act of republication, the statute of limitations would be retriggered endlessly and its effectiveness essentially eliminated.

*In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012), *as corrected* (Oct. 25, 2012). Many other courts, including one applying California law, have reached a similar result.  *See Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) (holding that "linking is more reasonably akin to the publication of additional copies of the same edition of a book, which is a situation that does not trigger the republication rule" (citing *Shively*, 31 Cal. 4th at 1245)); *see also Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 507 (6th Cir. 2015) ("Simply alerting a new audience to the existence of a preexisting statement does not republish it."); *Lokhova v. Halper*, 2020 WL 963032, at *10 (E.D. Va. Feb. 27, 2020) (finding that a hyperlink accompanied by a "passing reference to a general conclusion in the original article" did not constitute

republication); *U.S. ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1074 (W.D. Wash. 2012) ("[A]mere reference or URL is not a publication of the contents of the materials referred to."); *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016) (finding that a hyperlink was not a republication because it "does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication").

By contrast, courts have found that potentially defamatory remarks were republished when defendants posted content that "go[es] beyond merely hyperlinking." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC* ("*Enigma*"), 194 F. Supp. 3d 263, 277 (S.D.N.Y. 2016) (citing cases). Plaintiffs cite *Larue v. Brown*, where the Arizona Court of Appeals determined that republication occurred when the defendants responded to readers' comments on their allegedly defamatory articles and posted "updates and rebuttals" that "re-alleged the substance of the original articles." 235 Ariz. 440, 446 (Ariz. Ct. App. 2014). While a defamation claim based on the original articles would have been time-barred, the defendants' later comments "added to and altered the substance of the original material by providing additional information in response to a reader's questions, and re-urging the truth of the original articles in response to another reader's criticism." *Id.* Therefore, the new comments could serve as the basis for a defamation claim. Plaintiffs argue that, similar to the defendants in *Larue*, Mabray's 2019 Tweet "went beyond a mere hyperlink" because "Defendant made the conscious choice to repeat the same defamatory remarks by directing them to a new audience." Opp. at 14, 15.

The court agrees with Mabray that the Tweet did not republish the majority of the allegedly defamatory statements in the Blog Post. The text of the Tweet does not contain any statements about James or Penrose Hill or repeat any of the contents of the Blog Post. This is not like *Larue*, where the defendants added new comments that "re-alleged the substance of the original articles" and provided additional information to support their claims. *See* 235 Ariz. at 446. The situation here is closer to *Salyer*, where subsequent article's on the defendant's website linked to the allegedly defamatory article but did not change the original text of the article or repeat the contents of the article to a new audience. *See* 701 F. Supp. 2d at 916. Like the statements examined in *Salyer*, the challenged statements in the Blog Post were not presented to a new audience simply by virtue of

1    Mabray alerting other users that the Blog Post exists.[7]  *See id.*

2          However, in addition to linking to the original Blog Post, the Tweet includes some limited

3    content from the Blog Post that appears in the Tweet preview, namely the title of the article ("Fakers

4    Not Makers and The Return of Philip James"), a picture of Philip James, and a text quote ("There is

5    a new era of companies trying to capitalize on the new subscription economy in the wine industry.

6    Some good, some fakers.").  Since the Tweet does not merely reference the existence of these limited

7    statements but actually repeats them, the Tweet constitutes a republication of those statements.

8    Indeed, at the hearing, Mabray's counsel conceded that the limited information in the Tweet preview

9    constituted a republication of that information.[8]  *See also* Reply at 10.  But the vast majority of

10   statements in the Blog Post do not appear in the text of the Tweet or in the link preview, and therefore

11   were not republished via the Tweet.  At most, then, the Tweet constitutes a republication as to the

12   statements displayed in the link preview and not the rest of the statements in the Blog Post.

13          The other authorities cited by Plaintiffs do not require a different result.  *Giuffre v.*

14   *Dershowitz* did not examine republication in the context of linking to prior statements; instead, the

15   defendant argued that later statements were not republication because they were "substantively

16   identical" to previous statements he had made.  410 F. Supp. 3d 564, 567 (S.D.N.Y. 2019).  In other

17   words, he did not just reference his prior statements but actually repeated them.  *See id.*  Here, the

18   only statements repeated in the Tweet are those that appear in the link preview.  Similarly, while

19   *Enigma* did not reach the question of republication, it determined that the more recent statements

20   repeated "almost verbatim" the allegedly time-barred statements.  194 F. Supp. at 278.  While *Bacon*

21   *v. Nygard* found that links without additional commentary may constitute a republication, it limited

22   its observation to "the circumstances presented here where plaintiff alleges that defendants created

23   several media platforms specifically to attack him and promote the statements."  2019 WL 3254983,

24   at *7 (N.Y. Sup. Ct. July 19, 2019).  The facts motivating the *Bacon* court's decision are not

---

[7] At the hearing, Plaintiffs argued that, under *Yeager*, Mabray's Tweet directed the Blog Post to a new audience (Twitter instead of Medium) and therefore republished the Blog Post in its entirety. This argument is not convincing.  As explained in *Salyer*, the relevant consideration is whether the defamatory *content*, not just the host website, is directed to a new audience.  701 F. Supp. 2d at 916. Plaintiffs did not cite any authority that reflects their interpretation of *Yeager*.

[8] James claims that even these limited statements are defamatory.  Mabray argues that the contents of the Tweet preview are not defamatory because they at most contain nonactionable statements of opinion.  This argument is addressed in connection with Mabray's Rule 12(c) motion, below.

United States District Court
Northern District of California

presented in any detail in that opinion, but the situation appears to be unique and not similar to this case. The court also seemed to accept the general trend toward finding that links without additional content do not constitute republication. *See id.* In any event, to the extent that *Bacon* contradicts the authority cited above, it is clearly an outlier.[9]

In sum, the Blog Post was published more than a year prior to the commencement of this action and cannot serve as the basis for a defamation action. The only allegedly defamatory statements that are not time-barred are those that appear in the 2019 Tweet. Accordingly, Plaintiffs' claims with respect to the other statements are dismissed as untimely. The subsequent analysis applies only to the statements in the Tweet.

### B. Anti-SLAPP Motion

"The first step in analyzing an anti-SLAPP motion is determining whether the defendant successfully made 'an initial prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's rights of petition or free speech.'" *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 967 (N.D. Cal. 2013) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003)) (further citations omitted). The defendant's burden on this step "is not a particularly demanding one." *Daniel v. Wayans*, 8 Cal. App. 5th 367, 387 (Ct. App. 2017). A protected act includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Cal. Code Civ. Proc. § 425.16(e).

#### 1. Public Forum

The statements at issue were published on Mabray's public Twitter feed. "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute." *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 (2006); *see also Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190, 199 (Ct. App. 2017) (finding that "[i]t cannot be disputed that Facebook's website" is a public forum within the meaning of section 425.16(b)(1)); *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1252 (Ct. App. 2017), *as modified* (Apr. 19, 2017) (finding that postings on Facebook and Instagram were made in a public forum).

---

[9] To the extent *Bacon* stands for the proposition that there are exceptions to the general rule, there are no considerations in this case that would weigh in favor of finding that an exception should apply. The facts alleged here are not meaningfully distinguishable from those considered by multiple other courts.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs do not dispute that Twitter is a public forum for the purposes of the anti-SLAPP statute.  Accordingly, Mabray has met his burden on this issue.

### 2.    Public Interest

The anti-SLAPP statute does not define "public interest," but "its provisions 'shall be construed broadly' to safeguard 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'"  *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 693 (2012) (quoting Cal. Code Civ. Proc. § 425.16(a)).  In determining whether an issue is a matter of public interest, courts may consider "whether the subject of the speech or activity was a person or entity in the public eye or could affect large numbers of people beyond the direct participants; and whether the activity occur[red] in the context of an ongoing controversy, dispute or discussion."  *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145 (2019) (internal quotation marks and citations omitted).  "[A] matter of public interest should be something of concern to a substantial number of people.  Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest."  *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132 (2003) (internal citation omitted).  In addition, there should be "some degree of closeness between the challenged statements and the asserted public interest."  *Id.*  "[I]t is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate."  *FilmOn.com*, 7 Cal. 5th at 150 (quoting *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 898 (2004)).

Mabray asserts that the statements in the Tweet concern a matter of public interest because "the discussion of nontraditional business models for selling wine has been a subject of ongoing discussion and controversy."  Mot. at 10.  He claims that they relate to the "risk of consumers being confused or misled when buying wine through online clubs and similar nontraditional channels" and that "public discussion of consumer issues is considered speech in connection with a public issue."  Reply at 4 (citing *Makaeff*, 715 F.3d at 262).  Plaintiffs argue that at most, Mabray's statements generally "refer to a subject of widespread public interest" but lack "some degree of closeness between the challenged statements and the asserted public interest."  Opp. at 11-12 (quoting *FilmOn.com*, 7 Cal. 5th at 150).

Assuming without deciding that the topic of nontraditional business models for selling wine is a matter of public interest, the challenged statements in the Tweet do not have the requisite

14

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

closeness to that issue.   The Tweet simply asserts that private label wine "is more of a UK phenomenon than US" and relays Mabray's opinion that it is not "bad as long as it has purpose & transparency."   The statements in the link preview refer broadly to "fakers" within the "new subscription economy" without explanation of those terms.   A generic reference to transparency in the wine industry is exactly the kind of "broad and amorphous public interest" that courts have found not sufficiently connected to the specific statements at issue.   *See Bikkina v. Mahadevan*, 241 Cal. App. 4th 70, 84 (2015) (internal quotation marks and citations omitted) (statements relating to plagiarism in academic research were not sufficiently connected to the public concern about climate change); *Consumer Justice Ctr. v. Trimedica Int'l, Inc.*, 107 Cal. App. 4th 595, 602 (2003) (advertisements about natural alternatives to breast implants were not connected to debate about herbal supplements).   In the consumer context specifically, courts have found that challenged speech relates to a matter of public concern when it does not just present negative commentary about a certain business or business practice but provides information to aid consumers in choosing which businesses to patronize.   *See, e.g.*, *Wilibanks*, 121 Cal. App. 4th at 900 (website providing information about investigations against insurance brokers and warning consumers to not use their services was connected to a matter of public concern); *Wong v. Jing*, 189 Cal. App. 4th 1354, 1367 (2010) (internet review critical of a dentist raised a public issue about the use of silver amalgam in dental fillings and the use of nitrous oxide on children); *Carver v. Bonds*, 135 Cal. App. 4th 328, 344 (2005) (newspaper article about a doctor involved an issue of public concern where the information provided could assist others in choosing doctors); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 263 (9th Cir. 2013) (letter to the Better Business Bureau was written at least in part with the "intent to warn consumers about the educational experience at Trump University").   In this case, by contrast, the Tweet does not contain any information that would aid consumers in choosing between wine companies. It does not, for example, explain what "purpose & transparency" mean with respect to private label wine companies, give advice about how to tell a faker from a maker, or provide information about specific unscrupulous practices.   Nor does the Tweet warn consumers away from all private label wine since it explicitly acknowledges that not all such wine is bad.   At most, it makes a vague negative reference to "Naked & that ilk," but does not detail particular concerns about Naked or other unnamed companies.   The link preview also does nothing more than assert that some wine companies involved in the "new subscription economy" are "fakers," with no

United States District Court
Northern District of California

explanation of what that term means or how it should inform consumer choices. Therefore, the Tweet's vague reference to potentially poor or unethical business practices by some private wine label companies is not enough to bring it within the scope of anti-SLAPP protection. *See Rand Res., LLC v. City of Carson*, 6 Cal. 5th 610, 625 (2019) ("[W]e reject the proposition that any connection at all—however fleeting or tangential—between the challenged conduct and an issue of public interest would suffice to satisfy the requirements of [the anti-SLAPP statute].").

The contents of the Blog Post are closer to the asserted public interest, since the Blog Post lays out more detailed information about nontraditional wine businesses, specific companies, and the potential impact on consumer choices. But as the court explained above, the statements in the Blog Post are not at issue here because they are time-barred. Mabray cannot have it both ways: if his statements in the Blog Post were not republished in the Tweet for the purposes of the statute of limitations, then they may not be considered for the purpose of determining whether the challenged speech is a matter of public concern.[10]

In sum, Mabray has not met his burden to show that the statements in the Tweet are connected to a matter of public interest. Accordingly, the anti-SLAPP motion is denied.

## C.     Rule 12(c) Motion

California law provides that a plaintiff bringing a defamation claim must show four elements: "that defendants published the statements; that the statements were about plaintiff; that they were false; and that defendants failed to use reasonable care to determine the truth or falsity." *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 470 (2012). If the plaintiff is a public figure, then he must prove that the defendant acted with "actual malice." *Makaeff*, 715 F.3d at 258. Mabray argues that (1) Penrose Hill has no claim for defamation based on the statements in the Tweet because they are not "about" Penrose Hill; (2) the statements

---

[10] At the hearing, Mabray argued that the entire Blog Post can be considered for the purposes of determining whether there is a matter of public interest even though the Blog Post was not republished to reset the statute of limitations. Mabray cited the anti-SLAPP statute, which provides that a special motion to strike is available for "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue." Cal. Civ. Proc. Code § 425.16(b)(1). According to Mabray, this language means that the relevant public interest is evaluated based on the allegations in the complaint, which in this case includes the entire Blog Post. The court disagrees. Since the court dismissed Plaintiffs' claim to the extent it is based on the portions of the Blog Post that were not republished, a defamation action cannot arise from those statements. Mabray did not cite any caselaw reflecting his interpretation of subsection (b)(1).

are opinion rather than fact; (3) to the extent that the statements are factual, they are substantially true; and (4) even if the statements relay false facts about James, he is a public figure who has not adequately pleaded actual malice. The court addresses only the second argument because the Tweet does not contain statements of fact about either Plaintiff that could be deemed "false" for the purposes of a defamation claim.

Defamation claims cannot challenge statements of opinion that do not "contain a provably false factual connotation." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Thus, a court reviewing a claim of defamation must ask the threshold question of whether a reasonable factfinder could conclude that the contested statement "implies an assertion of objective fact." *Gilbrook v. City of Westminster*, 177 F.3d 839, 861–62 (9th Cir. 1999), *as amended on denial of reh'g* (July 15, 1999). The Ninth Circuit has adopted a three-part test for determining whether a statement implies an assertion of fact, considering the totality of the circumstances in which it was made:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995).

Mabray argues that the statements in the Tweet do not reasonably imply assertions of facts about Plaintiffs. First, he asserts that the statements were made on a social media platform where people air personal views and in response to a "larger string of tweets offering various opinions about new distribution and sales models for wine." Mot. at 15. Therefore, the context was such that the audience would expect persuasive argument rather than provable assertions of fact. *Id.*; *see also Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 784 (9th Cir. 1980) ("[E]ven apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate . . . or other circumstances in which an audience may anticipate efforts by the parties to persuade others to their positions . . . ." (internal quotation marks and citation omitted)). Second, he contends that a phrase such as "fakers not makers" is the sort of "loose, figurative" language that "tends to negate the impression that a statement contains an assertion of verifiable fact." *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1123 (C.D.

17

Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000) (quoting *Milkovich*, 497 U.S. at 21).   Finally, Mabray argues that the term "faker" is an imprecise term that cannot be proven true or false.   Mot. at 16; *see Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992) (holding that the words "fake" and "phony" in reference to a musical-comedy version of the Phantom of the Opera are "unprovable, since those adjectives admit of numerous interpretations"); *Krinsky v. Doe 6*, 159 Cal. App. 4th 1154, 1177 (2008) (finding that in the context of an online message board containing "vulgar and insulting" language, a statement that the plaintiff had a "fake medical degree" was obviously intended as ridicule rather than a statement of fact).

Plaintiffs' opposition on this point focuses almost exclusively on the statements contained in the Blog Post, including statements about James's "egregious act of scraping" data from a competitor's website, the "hoax" he perpetrated with his water-to-wine fundraiser, and Plaintiffs' alleged practice of "substituting plonk in the place of artisanal wine." *See* Opp. at 18-22.   However, the only statements that are actionable are those that appear in the Tweet because the Blog Post falls outside the statute of limitations for defamation.   The Tweet itself, insofar as it has any connection to either Plaintiff, at most implies that they may be "fakers."   Even that much is unclear: the text snippet acknowledges that some private label wine companies are good, so the reference to James in the Tweet preview does not clearly imply that he is a "faker" rather than a "maker."   Moreover, while "faker" might imply an assertion of fact in some circumstances, the context of the Tweet as a whole does not impute any objective connotation to that term.[11]   *See, e.g.*, *Ferlauto v. Hamsher*, 74 Cal. App. 4th 1394, 1398, 1404 (1999) (finding that the phrase "loser wannabe lawyer" and "frivolous lawsuit" did not reasonably imply factual statements about an attorney's abuse of the legal process).   The phrase "some good, some fakers" also implies that "fakers," like "good," is a subjective assessment of quality rather than a statement of fact.

Accordingly, the court finds that the contested statements contained in the Tweet do not reasonably imply an assertion of objective fact that could serve as the basis of a defamation claim. Mabray's Rule 12(c) motion is granted on this basis.

---

[11] At the hearing, Plaintiffs seemed to argue that "faker" could imply an accusation that they do not make wine at all, which would be a statement of fact that is capable of empirical verification.   This is nonsensical.   The Tweet discusses private label wine companies and is clearly not concerned about non-winemakers.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### IV.    LEAVE TO AMEND

Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter of course, at least until the defendant files a responsive pleading. Fed. R. Civ. P. 15(a)(1). After that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be given "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc*., 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted). In the absence of an "apparent" reason, such as undue delay, bad faith or dilatory motive, prejudice to the opposing party, futility of the amendments, or repeated failure to cure deficiencies in the complaint by prior amendment, it is an abuse of discretion for a district court to refuse to grant leave to amend a complaint. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lockheed Martin Corp. v. Network Sols., Inc*., 194 F.3d 980, 986 (9th Cir. 1999). Rule 12(c) does not mention leave to amend; however, "[c]ourts have discretion to grant leave to amend in conjunction with 12(c) motions, and may dismiss causes of action rather than grant judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 982 F. Supp. 1396, 1401 (N.D. Cal. 1997), *aff'd*, 237 F.3d 1026 (9th Cir. 2001) (internal quotation marks and citation omitted); *see also Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (finding that dismissal with prejudice under Rule 12(c) is "not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment") (quoting *Eminence Capital, LLC*, 316 F.3d at 1052)).

Here, although it seems doubtful that the issues identified in this order can be addressed through amendment, the court cannot say as a matter of law that amendment would be futile. There are no other factors weighing against amendment of the pleadings, such as undue delay or prejudice. Therefore, Plaintiffs are granted leave to amend their complaint to address the deficiencies identified above.

### V.    CONCLUSION

For the reasons stated above, Mabray's motion to strike under CCP § 425.16 is denied and his Rule 12(c) motion is granted. Plaintiffs shall file any amended complaint by September 1, 2020.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: August 18, 2020



Donna M. Ryu
Judge Donna M. Ryu
United States Magistrate Judge